# UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

The City of Farmington Hills
Employees Retirement System,
individually and on behalf of
all others similarly situated,

       Plaintiff,

v.

Wells Fargo Bank, N.A.,

       Defendant.

Civil No. 10-4372 (DWF/JJG)

**MEMORANDUM
OPINION AND ORDER**

---

David M. Cialkowski, Esq., Carolyn G. Anderson, Esq., Brian C. Gudmundson, Esq., and June Pineda Hoidal, Esq., Zimmerman Reed, P.L.L.P.; Peter A. Binkow, Esq., Kara M. Wolke, Esq., Leanne E. Heine, Esq., Casey E. Sadler, Esq., Elizabeth M. Gonsiorowski, Esq., Jill Duerler, Esq., and Robin Bronzaft Howald, Esq., Glancy Binkow & Goldberg LLP; Thomas C. Michaud, Esq., Vanoverbeke, Michaud & Timmony P.C.; Christopher D. Kaye, Esq., E. Powell Miller, Esq., Jayson E. Blake, Esq., and Sharon S. Almonrode, Esq., The Miller Law Firm, P.C.; and Avraham Noam Wagner, Esq., The Wagner Firm, counsel for Plaintiff.

William A. McNab, Esq., John N. Sellner, Esq., Justin H. Jenkins, Esq., and Brooks F. Poley, Esq., Winthrop & Weinstine, PA; and Lindsey A. Davis, Esq., Daniel J. Millea, Esq., Michael R. Cashman, Esq., Lawrence T. Hoffman, Esq., Richard M. Hagstrom, Esq., James S. Reece, Esq., Michael E. Jacobs, Esq., Rory D. Zamansky, Esq., Zelle Hofmann Voelbel & Mason LLP, counsel for Defendant.

---

## INTRODUCTION

    This matter is before the Court on Plaintiffs' Motion to Exclude the Reports and

Testimony of Defendant's Proposed Experts (Doc. No. 302), Plaintiffs' Motion for

Partial Summary Judgment on Certain of Wells Fargo's Affirmative Defenses (Doc.

No. 309), Wells Fargo Bank, N.A.'s Motion for Partial Summary Judgment (Doc.

No. 315), and Wells Fargo Bank, N.A.'s Motion to Decertify the Class (Doc. No. 322).

For the reasons set forth below, the Court denies the motion to exclude expert testimony

and grants in part and denies in part the remaining motions.

## BACKGROUND

The City of Farmington Hills Employees Retirement System ("CFHERS") and

other similarly situated institutional investors (together, "Plaintiffs") participated in a

securities lending program ("SLP") offered through Wells Fargo Bank, N.A. ("Wells

Fargo" or "Defendant").  As part of Wells Fargo's SLP, participants would allow Wells

Fargo to loan their securities to third-party borrowers in return for cash collateral.  (Doc.

No. 277, Am. Compl. ¶ 5.)  Wells Fargo would then invest the cash collateral.  (*Id.*)

Plaintiffs entered into Securities Lending Agreements ("SLAs") with Wells Fargo, which

governed their relationships with Defendant.  (*See, e.g.,* Doc. No. 312, Binkow Decl. ¶ 2,

Ex. 10.)  On Plaintiffs' behalf, Wells Fargo lent securities to Cheyne Finance LLC

("Cheyne"), Stanfield Victoria Finance, Ltd. ("Victoria"), White Pine

Finance/Whistlejacket Finance ("Whistlejacket"), and Lehman Brothers Holdings, Inc.

("Lehman"), among others.  (Doc. No. 346, Davis Aff. ¶ 2, Ex. 13 ¶ 24.)

Plaintiffs assert the following six counts against Wells Fargo:  (1) Breach of

Fiduciary Duty; (2) Breach of Contract; (3) Violation of Minnesota Prevention of

Consumer Fraud Act – Minn. Stat. § 325F.69 ("MCFA claim"); (4) Unlawful Trade

Practices – Minn. Stat. § 325D.13 ("UTPA claim"); (5) Deceptive Trade Practices –

Minn. Stat. § 325D.44 ("DTPA claim"); and (6) Civil Theft – Minn. Stat. § 604.14.  (Am.

Compl. ¶¶ 50-88.)  On March 27, 2012, the Court granted Plaintiffs' motion for class

certification with respect to the breach of fiduciary duty, breach of contract, and MCFA

claims.  (Doc. No. 120 at 19.)

Plaintiffs and Wells Fargo now both move for partial summary judgment.  Wells

Fargo also moves for decertification of the Class, and Plaintiffs move to exclude opinions

of three of Wells Fargo's experts.

## I.    Wells Fargo's Securities Lending Program and Business Trust

In October 2000, Wells Fargo established the Wells Fargo Trust for Securities

Lending (the "Trust").  (Davis Aff. ¶ 2, Ex. 16 ¶ 16.)  The Trust is a Maryland Business

Trust governed by a Declaration of Trust, for which Wells Fargo served as Trustee.

(Davis Aff. ¶ 2, Ex. 1 at 1.)  The Trust contained three series, or funds:  the Enhanced

Yield Fund (the "EY Fund"), the Collateral Investment Trust (the "CI Trust") and the

Collateral Investment for Term Trust (the "CI Term Trust").  (Davis Aff. ¶ 2, Ex. 16

¶ 19.)  The majority of Class members, including CFHERS were Trust securities

shareholders.  (*Id*. ¶ 20.)

The Declaration of Trust describes the powers of the Trustee, Wells Fargo, as

follows:

> The Trustee shall have full, exclusive and complete power and discretion to
> manage and control the business and affairs of the Trust, and to make all
> decisions affecting the business and affairs of the Trust.  No Shareholder or
> assignee of Shares, as such, shall have any authority, right or power to bind

> the Trust or to manage or control, or to participate in the management or control of, the business and affairs of the Trust . . . . To the fullest extent permitted by applicable law, the Trustee shall not in any way be bound by current or future laws or customs applicable to trust investments, but shall have full power and authority to make any investments, which in its sole discretion, deems proper to accomplish the purposes of the Trust, consistent with the investment objectives established but the Trustee for the Trust and/or the separate Series of the Trust.  The Trustee may exercise all of its powers without recourse to any court or other authority.

(Davis Aff. ¶ 2, Ex. 1 § 3.1.)  The Declaration of Trust explains that "[a]ny action by the Trustee in its capacity as Trustee shall be deemed an action on behalf of the Trust or applicable Series, and not an action in an individual capacity."  (*Id*.)  The Declaration of Trust also sets forth a "Standard of Care for ERISA Shareholders":

> [T]he Trustee hereby acknowledges that it is a fiduciary of such plan to the extent of the investment of assets of such plan in any Shares of the Trust. As such, the Trustee shall perform its duties herein with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character with like aims.

(*Id*. § 3.3.)

All members of the Class, including CFHERS entered into SLAs with Wells Fargo.  (Am. Compl. ¶ 22; *see, e.g.,* Binkow Decl. ¶ 2, Exs. 10-12.)  All of the SLAs include the language, "[t]he prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."  (Binkow Decl. ¶ 2, Exs. 10-12.)[1]

---

[1]     Plaintiffs submitted three SLAs containing the sentence:  "The prime considerations for the investment portfolio shall be safety of principal and liquidity requirements."  Wells Fargo does not appear to dispute Plaintiffs' assertion that all the SLAs contained this language.

The SLAs indicate that Wells Fargo acts as the agent for participants and that as the agent, Wells Fargo's "[p]rime considerations for the investment portfolio shall be safety of principal and liquidity requirements."  (Binkow Decl. ¶ 2, Exs. 10 ¶ 2f; 11 ¶ 2f & 12 ¶ 2f.)  The SLA describes that a program participant may "terminate any loan of securities for any reason at any time."[2]  (Binkow Decl. ¶ 2, Exs. 10 ¶ 4; 11 ¶ 4 & 12 ¶ 4.) The SLA further states:

> In the event that the Borrower fails to return the lent security, the Bank will indemnify the Participant's accounts in the following amounts:  (a) The difference between the closing market value of the security on the date it should have been returned to the account and the cash collateral substituted for the lent securities, or (b) In the case of collateral received in kind, the difference between the closing market value of the security on the date it should have been returned to the account and the closing market value of the collateral in kind on the same date.

(Binkow Decl. ¶ 2, Exs. 10 ¶ 8; 11 ¶ 8 & 12 ¶ 8.)  The SLA further states that the "Participant assumes all risk of loss arising out of collateral investment loss and any resulting collateral deficiencies.  The Bank expressly assumes the risk of loss arising from negligent or fraudulent operation of its Securities Lending Program."  (Binkow Decl. ¶ 2, Exs. 10 ¶ 8; 11 ¶ 8 & 12 ¶ 8.)

Each series or fund within the Trust has a corresponding Subscription Agreement. (*See* Davis Aff. ¶ 2, Exs. 3, 5 & 8.)  Wells Fargo asserts that each Plaintiff became a

---

[2]     Plaintiffs argue that Wells Fargo failed to effectively monitor or measure the fund, in particular that Wells Fargo allowed SLP participants to leave with the full value of the securities at the time of entrance, even if the market value had changed.  In October of 2007, Wells Fargo Public Safety of Arizona withdrew $1.9 million out of two of the Trust pools, exiting at the entrance price of ten dollars per share, despite a three cent

(Footnote Continued on Next Page)

participant in the EY Fund and/or the CI Term Trust by signing a Subscription

Agreement and/or by purchasing shares in the Trust.  (Davis Aff. ¶ 2, Ex. 16 ¶ 20.)  Each

of the three Subscription Agreements included a *Representations and Warranties* section.

(Davis Aff. ¶ 2, Exs. 3 § 5; 5 § 5 & 8 § 5.)

Though they somewhat differ in language, upon signing Subscription Agreements

for the EY Fund and CI Term Trust, CFHERS represented, among other things, that it:

(a) was an "accredited investor"; (b) relied "solely on the facts and terms set forth in the

Subscription Agreement, the Confidential Memorandum and any additional documents

furnished or made available by the Trustee including the Declaration of Trust" and  that

"no person has made any representation of any kind or nature to induce the Subscriber to

enter into this Subscription Agreement or to purchase Shares except as specifically set

forth in such documents"; (c) made "an independent investigation of the pertinent facts

relating to the proposed business and operations of the Trust, has reviewed carefully the

terms of the Confidential Memorandum and this Subscription Agreement to the extent the

Subscriber deems necessary in order to be fully informed . . . and understands the nature

of an investment in the Trust"; (d) had not been offered or sold shares by the Trust,

Trustee or anyone representing the Trust "by means of any form of general solicitation or

general advertising," and "has not received, paid or given, directly or indirectly, any

commission or remuneration for or on account of any sale, or the solicitation of any sale,

---

(Footnote Continued From Previous Page)
decrease in fair market value.  (Binkow Decl. ¶ 2, Ex. 32 at 2.)

or any Shares to it"; and (e) had "adequate means of providing for . . . financial needs and possible contingencies and has assets or sources of income that, taken together are more than sufficient so that [it] can bear the risk of the loss of the . . . entire investment." (Davis Aff. ¶ 2, Ex. 3 § 5; *see also* Davis Aff. ¶ 2, Exs. 5 § 5 & 8 § 5.)

Each series or fund within the Trust also had a set of investment guidelines. (Davis Aff. ¶ 2, Exs. 4, 6 & 9.) The investment guidelines for the EY Fund, the CI Trust, and the CI Term Trust all contain the language, "the prime considerations for [this fund or trust] shall be preservation of principal and daily liquidity requirements." (Davis Aff. ¶ 2, Exs. 4, 6 & 9.) Each series' guidelines contained the same standards for diversification:

- Maximum of 5% of the portfolio will be invested in any single issuer except for the U.S. Government and its agencies and instrumentalities, registered money market funds, business trusts that are 2a-7 complaint or 2a-7-like, and repurchase agreements collateralized by any approved investments.
- Maximum of 15% of the portfolio will be invested in illiquid instruments.
- Maximum of 25% of the portfolio will be invested in any industry or sector, except the financial services or banking industry, which may exceed 25%.

(Davis Aff. ¶ 2, Ex. 9; *see* Davis Aff. ¶ 2, Exs. 4 & 6.)

The diversification percentages are identical to those in the confidential memoranda for the CI Trust and CI Term Trust. (Binkow Decl. ¶ 2, Exs. 13 ¶ V & 14 ¶ V.) The confidential memorandum for the EY Fund also includes the 5% from a single issuer and maximum of 15% illiquid securities standards. (Binkow Decl. ¶ 2, Ex. 15 at 4.) All three confidential memoranda include the language, "the prime considerations for

such investments are safety of principal and daily liquidity requirements." (Binkow Decl. ¶ 2, Exs. 13 ¶ V, 14 ¶ V & 15 at 3.) All of the confidential memoranda also include the statement: "The [trust or fund] will endeavor to maintain a stable $10.00 price per Share, although no assurance can be given that it will achieve its investment objective or maintain a stable share value." (Binkow Decl. ¶ 2, Exs. 13 ¶ V; 14 ¶ V &15 at 3.) Each memorandum also includes a description of risk factors. (Binkow Decl. ¶ 2, Exs. 13 ¶ VI; 14 ¶ VI & 15 at 5-6.)

CFHERS became a Trust shareholder in June of 2006 and subscribed to the EY Fund and CI Term series. (Doc. No. 328 ("Zamansky Aff. II") ¶ 2, Exs. 1 & 2.) Apart from the Trust, Wells Fargo separately managed several collateral accounts each with its own investing guidelines. (*See, e.g.,* Zamansky Aff. II ¶ 2, Exs. 6-9.) Six Class members suffered losses from participating in the SLP but were not members of the Trust. (Doc. No. 326, Ahlstrand Aff. ¶ 9.) CFHERS was not part of any non-Trust collateral funds. (*Id.*)

As a Trust investment, the Trustee purchased securities issued by Structured Investment Vehicles ("SIVs"). (Lindsey Aff. ¶ 2, Ex. 16 ¶ 77.) The Trust purchased at least 670 commercial paper and Medium Term Notes ("MTNs") issued by SIVs since 2003. (*Id.* ¶ 78.) Plaintiffs argue that investing in SIVs put Wells Fargo above its maximum fifteen percent illiquidity standard. (Binkow Decl. ¶ 2, Ex. 2 at 116-118, 142.) Plaintiffs also assert that Wells Fargo did not follow its standard of a maximum five

percent from any single issuer, in particular, that it exceeded the five percent limit for Victoria and Lehman.  (Doc. No. 311 at 7-8; Binkow Decl. ¶ 2, Ex. 2 at 157-177.)

As of July 31, 2007, SIV holdings made up 15.57% of all the Trust's holdings, 11.70% of the CI Trust holdings, 35.40% of the CI Term Trust holdings, and 10.5% of the EY Fund holdings.  (Binkow Decl. ¶ 2, Ex. 2 at 140.)  The CI Trust held Cheyne and Lehman holdings.  (*Id*. at 140, 158.)[3]  The CI Term Trust held Cheyne, Lehman, and Victoria holdings. (*Id.*)  The EY Fund held Cheyne, Whistlejacket, and Lehman holdings. (*Id.*)

Cheyne, Victoria, Whistlejacket, and Lehman all defaulted on their issued securities and have failed to mature at par.  (Davis Aff. ¶ 2, Ex. 13 ¶ 24.)  Cheyne went into receivership on September 5, 2007.  (Davis Aff. ¶ 2, Exs. 42 & 16 ¶ 107.)  In October of 2007, Cheyne experienced an insolvency event and ceased making payments. (Davis Aff. ¶ 2, Ex. 16 ¶ 107.)  Three Cheyne-issued MTNs held by Trust Class members and two held by non-trust Class members defaulted.  (Doc. No. 347, Adams Aff.

---

[3]     Victoria holdings made up 3.61% of the CI Term trust holdings, and 1.41% of all Wells Fargo securities lending holdings.  (Binkow Decl.  ¶ 2, Ex. 2 at 140.)  Cheyne made up 0.80% of the CI Trust's holdings, 2.89% of the CI Term Trust's holdings, 1.18% of the EY Fund's holdings, and 1.33% of the total SLP's holdings.  (*Id.*)  Whistlejacket holdings made up 0.56% of the EY Fund's holdings and 1.05% of all Wells Fargo securities lending holdings.  (*Id.*)  As of July 31, 2007, Lehman holdings made up 1.34% of the CI Trust's holdings, 4.19% of the CI Term Trust's holdings, 0.74% of the EY Fund's holdings, and 1.64% of all Wells Fargo securities lending holdings.  (*Id.* at 158.)  As of March 16, 2008, Lehman holdings made up 1.70% of CI Trust's holdings, 4.03% of CI Term Trust's holdings, 1.35% of EY Fund's holdings, and 2.23% of all Wells Fargo securities lending holdings.  (*Id.*)

¶¶ 14-15.)  Cheyne restructured into Gryphon and is now making payments from underlying assets on a monthly basis.  (Davis Aff. ¶ 2 Ex. 13 ¶ 26.)

    The absence of available purchasers for short-term fixed income notes eliminated funding for Victoria.  (Davis Aff. ¶ 2 Ex. 16 ¶ 116.)  Victoria defaulted and went into restructuring in January of 2008.  (*Id*.)  Two MTNs held by Trust Class members and eight MTNs held by non-trust members defaulted.  (*Id*. at ¶ 116- 117; Adams Aff. ¶¶ 21-22.)  Victoria was restructured into VFNC Ltd., which is now making payments from underlying assets.  (Davis Aff. ¶ 2 Exs. 16 ¶ 118 & 13 ¶ 27; Adams Aff. ¶ 23.)

    Similarly, the absence of available purchasers for short-term fixed income notes eliminated funding for Whistlejacket.  (Adams Aff. ¶ 30.)  Whistlejacket breached its Capital Value trigger resulting in an "Enforcement Event" and causing it to enter receivership.  (*Id*.)  Whistlejacket defaulted in February 2008.  (*Id*.)  One MTN held by a non-trust Class member defaulted.  (*Id*. ¶ 31.)  Whistlejacket has made cash payments to Wells Fargo funds representing 83.813% recovery.  (*Id*. ¶  32; Davis Aff. ¶ 2, Ex. 53.)

    Lehman's bankruptcy occurred on September 15, 2008.  (*Id*., Ex. 16 ¶ 119; Adams Aff. ¶ 33.)  In the year and weeks before the bankruptcy, Wells Fargo considered whether or not to sell its holdings in Lehman and ultimately decided not to sell.  (Davis Aff. ¶ 2, Exs. 16 ¶¶ 119-24 & 59-60; Adams Aff. 34-39.)

    CFHERS itself purchased Lehman securities, which it held at the time of Lehman's bankruptcy.  (Zamansky Aff. II ¶ 2, Ex. 12.)  CFHERS' Annual Statement, July 1, 2007 through June 30, 2008, lists two Lehman holdings.  (Zamansky Aff. II ¶ 2,

Ex. 11 at 18.)  The first of these holdings was set to mature in 2027 and the second in 2038.  (*Id*.)  CFHERS maintained these holdings until they defaulted when Lehman went bankrupt.  (Zamansky Aff. II ¶ 2, Exs. 12 & 13 at 535: 6-18.)

Plaintiffs argue that Wells Fargo misleadingly obscured losses.  Plaintiffs assert that Wells Fargo knew the fund was failing and did not tell SLP participants and encouraged them to stay in the SLP. In the February 2008 Wells Fargo Securities Lending Market Update, Wells Fargo describes Cheyne and Victoria as in the "restructuring process" and recommends that "clients remain enrolled in the securities lending program while we work through this period of market disruptions."  (Binkow Decl. ¶ 2, Ex. 63 at 11, 13.)

## II.     Wells Fargo's Experts

Plaintiffs move to exclude the expert reports and testimony of three of Wells Fargo's expert witnesses:  Charles Porten ("Porten"), John Peavy ("Peavy"), and John McConnell ("McConnell").

### A.     Porten

Porten has a B.S. in Mechanical Engineering from the University of Pennsylvania and an M.B.A. in Finance from Harvard University.  (Doc. No. 305 ("Zamansky Aff. I") ¶ 2, Ex. 1 ¶ 5.)  He has worked in various positions in the financial industry for over thirty years.  (*Id.* ¶¶ 2-4.)  Porten has been qualified as an expert to testify at trial, arbitration hearings, and Financial Industry Regulatory Authority proceedings over thirty times in the last four years.  (*Id.* ¶ 5, App. B; Doc. No. 341, Porten Aff. ¶ 4.)

In conducting his analysis, Porten relied upon documents and materials produced in this litigation, publicly available information, and industry publications. (Zamansky Aff. I ¶ 2, Ex. 1 ¶ 7, App. C.) Porten also utilized depositions and conversations with Wells Fargo employees. (*Id*.) Porten conducted interviews with Roger Adams, Matthew Grimes, Laurissa Ahlstrand, Ajay Mirza, and Matt Robertson. (Porten Aff. ¶ 2.) Porten asserts that he conducted these interviews to confirm the accuracy of his factual understanding of the other materials he had already reviewed. (*Id*.)

Porten's report summarizes his opinion:

- The SLP's resources, including key personnel, committee structures, and outside advisors, comported with industry standards and allowed Wells Fargo to fulfill its fiduciary duties with respect to management of the SLP.
- The SLP complied with standard industry practices and fulfilled its fiduciary duty with respect to the four key functions performed . . . .
- With respect to the securities at issue, specifically instruments issued by Cheyne, Victoria, and Lehman, the SLP exercised prudence and appropriate due diligence in the face of unprecedented financial crisis . . . .
- The SLP fulfilled its fiduciary duty to treat clients fairly, in light of the changing market circumstances, with respect to exit policies and disaggregation of the Business Trust.
- Mr. Black bases many of his opinions on hindsight judgment, which is contrary to industry standards for evaluation fiduciary duty. Because a fiduciary's decisions require professional judgment, a proper evaluation of fiduciary duty requires assessing the processes and practices the fiduciary followed in the exercise of that judgment, not a hindsight evaluation of individual decision outcomes. An investment decision that **in hindsight** has an adverse outcome does not constitute a breach of fiduciary duty . . . .
  In summary, the SLP consistently acted in the best interests of its clients in making and communicating investment decisions, thereby fulfilling its fiduciary duties.

(Zamansky Aff. I ¶ 2, Ex. 1 ¶¶ 10-11 (emphasis in original).)

Porten relied heavily on conversations and depositions regarding credit research operations.  (*See, e.g.*, *id.*, ¶¶ 44-48, nn.54-66.)  In particular, Porten drew his characterization of the close relationship between the SLP staff and the research teams at the two involved research firms, WCM and Galliard, from a conversation with Adams and the depositions of Adams and Grimes.  (*Id.* ¶¶ 44-45.)  Porten drew his description of the process of adding investments to the Approved List primarily from Grimes' depositions, and Porten drew his description of the process of selecting investments from the Approved List from a conversation with Adams, two of Adams' depositions, and the investment guidelines for the three funds within the Trust.  (*Id.* ¶ 46, nn.59-61; ¶ 61, n.113.)  Porten based his understanding that purchases always complied with the Approved List and the investment guidelines on a conversation with Adams and depositions of Adams, Grimes, and Ahlstrand.  (*Id.* ¶ 64, n.132.)  Porten relied solely on a conversation with Adams in his description of Adams' informal reviews for liquidity.  (*Id.* ¶ 66, n.127.)  Porten based his understanding regarding communication with SLP participants in part on conversations with and depositions of Ahlstrand.  (*Id.* ¶ 88, n.196; ¶ 89, n.210.)

## B.     Peavy

Peavy received a Ph.D. in finance from the University of Texas at Arlington, an M.B.A. in finance from the University of Pennsylvania and a B.B.A. in banking and finance from Southern Methodist University.  (Zamansky Aff. I ¶ 2, Ex. 2 ¶ 8.)  He has been involved in investment-related services for more than forty years.  (*Id.* ¶ 5.)  Peavy

has been qualified as an expert at trial or arbitration twenty times in the past ten years.

(Doc. No. 342, Peavy Aff. ¶ 3.)

Peavy's report summarizes his opinion:

- The program documents related to CFHERS's participation in the Wells Fargo SLP are consistent with custom and practice in securities lending, including in the identification of the risk associated with loss in value of collateral investments.

- The securities purchased by the Wells Fargo SLP were suitable for the Business Trust in which CFHERS was invested. These securities were consistent with the Investment Objectives and complied with the Investment Constraints (as outlined in the Investment Guidelines) at the time of purchase. Moreover, these types of securities were consistent with the types of securities purchased for the collateral accounts of other securities lending programs.

- CFHERS's allegations are centered on developments that occurred in the wake of the collapse in the credit markets beginning in the summer of 2007. The global financial crisis was unexpected and unprecedented in its severity within my more than 40 years of professional experience. The crisis adversely affected everyone participating in the credit markets, including investors in highly-rated and relatively short-term fixed income securities.

- The Wells Fargo SLP's actions during the global financial crisis with respect to retaining collateral investments and avoiding selling these securities at a loss at distressed prices were consistent with the action of other securities lending programs during this period of market turbulence and were reasonable.

- While Wells Fargo's actions should be evaluated within the context of the time that they were taken, I note that, even ex post, Wells Fargo's decisions to stay the course were reasonable and many have minimized losses. Credit markets have begun recovering, and unrealized losses have been, and continue to be, reduced over time. Many of the types of securities that CFHERS identified as inappropriate for the portfolios have matured and paid in full; almost all of the remaining securities are making their regularly scheduled payments. The few securities that have defaulted still retain value.

- The Black Report and the O'Driscoll Report are flawed and inaccurate. Among other errors, these Reports misrepresent the nature and risk profile of securities lending programs and collateral investments; mischaracterized the economics of securities lending;

14

> misconstrue Wells Fargo SLP documents related to lending of securities
> and collateral reinvestments incorrectly evaluate the securities
> purchased by the Wells Fargo SLP; make the wholly unsupportable
> arguments that Wells Fargo should have acted on the market "warnings"
> about the global financial crisis and prepared for the global financial
> crisis, as well that Wells Fargo should have anticipated the Lehman
> bankruptcy; and incorrectly claim that Wells Fargo had a conflict of
> interest due to the fee structure of the Wells Fargo SLP. . . .

(Zamansky Aff. I ¶ 2, Ex. 2 ¶ 17.)

Peavy considered a number of sources in rendering his opinion, including interviews with, and depositions of, Wells Fargo employees, Wells Fargo documents, trial testimony and legal filings, and publicly available documents. (Zamansky Aff. I ¶ 2, Ex. 2, App. C.) In his report are citations to interviews with Roger Adams. Peavy asserts that these interviews were only used to confirm the accuracy of his factual understanding of the "thousands of documents and testimony that I have reviewed." (Peavy Aff. ¶ 2.)

In particular, Peavy cites to an interview with Adams regarding his understanding of the fluctuations of the liquidity requirement in response to higher volumes of returned loans. (Zamansky Aff. I ¶ 2, Ex. 2 ¶ 48, n.51.) Peavy bases his understanding that the SLP purchased investments that were permissible under the guidelines and consistent with "prime considerations of preservation of principal and daily liquidity requirements" on an interview with Adams, as well as the deposition of Michael Dougherty. (*Id.* ¶ 86, n.134.) Peavy cites the description of his understanding about the portion of revenue generation by the SLP and that it would be "economically irrational for Wells Fargo to purposefully take excessive risks in the Wells Fargo SLP" as being drawn from an

interview with Adams, but also interrogatory responses from the *WRCA* trial.  (*Id.* ¶ 213, n.401.)[4]

Plaintiffs assert that Peavy is relying on hearsay and simply "parroting" Adams' opinion as his own, which Plaintiffs argue is grounds for exclusion of his report and testimony.

### C.     McConnell

McConnell received a B.A. in Economics from Denison University, an M.B.A. from the University of Pittsburgh, and a Ph.D. in Finance from Purdue University. (Zamansky Aff. I ¶ 2, Ex. 3 ¶ 21.)  He has had a long career in academia, served on a number of boards in the private sector, and has consulted for government agencies.  (*Id.* ¶¶ 21-25.)  He has published over seventy-five articles in peer-reviewed journals and serves on the editorial boards of a number of finance related journals.  (*Id.* ¶¶ 24-25.)

McConnell concluded that CFHERS experienced economic losses (the net shortfall in Wells Fargo's SLP less what its net shortfall would have been in the alternative SLP) of $0.7 million.  (*Id.* ¶ 15.)  He further concluded that eight of the selected Class members experienced economic gains, one experienced economic losses of zero, and one selected Class member moved its securities to another SLP before December 31, 2012 so there is insufficient data to calculate its shortfall.  (*Id.*)  The

---

[4]     *See generally, Workers' Comp. Reins. Ass'n v. Wells Fargo Bank, N.A.*, 2010 WL 3341483 (Minn. Dist. Ct. Jul. 09, 2010), *aff'd* 2012 WL 1253094 (Minn. Ct. App. Apr. 16, 2012), *review denied* (June 27, 2012).

economic losses of the selected Class members "differ both in the dollar amount and relative to their level of participation in the [SLP]." (*Id*. ¶ 16.)

McConnell used a three-part process to calculate experienced economic losses of selected Class members. (*Id*. ¶ 10.) First, he calculated the "shortfall" for each selected Class member as of December 31, 2012, that resulted from its participation in the Wells Fargo SLP. (*Id*.) Second, he calculated each selected Class member's "net shortfall" by subtracting securities lending earnings that resulted from participation in the SLP from the previously calculated shortfall. (*Id*.) Third, he compared each selected Class member's net shortfall with what their net shortfall would have been if they had participated in an alternative SLP. (*Id*.) The difference between net shortfall for the Wells Fargo SLP and the alternative SLP are what McConnell considers to be the economic loss of each selected Class member. (*Id*.)

To calculate the shortfall for the selected Class members that remained in the SLP as of December 21, 2012, McConnell started with the amount owed to security borrowers as of December 31, 2012. (*Id*., App. D.) He then took that amount, less the value collateral securities held in that participant's individual collateral account as of December 31, 2012, plus net cash contributions made to the participant's individual collateral account between June 30, 2007 and December 31, 2012, less proceeds from the sale of transferred securities, less the principal payments received by the participant on transferred securities, less the value of transferred securities remaining in the participant's individual collateral account as of December 31, 2012. (*Id*.)

To calculate the shortfall for selected Class members that exited the SLP before December 31, 2012, McConnell calculated the amount owed to security borrowers as of the exit date, less proceeds from the sale of securities that were sold at that time, plus net cash contributions that the participants made to their individual collateral accounts between June 30, 2007 and December 31, 2012, less proceeds from the sale of transferred securities sold from the participants' non-SLP account between the exit date and December 31, 2012, less principal payments received on transferred securities between the exit date and December 31, 2012, less the value of transferred securities remaining in the non-SLP account.  (*Id.*)

To determine the prices of collateral and transferred securities, McConnell collected prices from Bloomberg L.P., IDC, Capitol IQ, and Wells Fargo investment reports.  (*Id.*)  He used the lowest prices from these sources as the price for each of the securities as of December 31, 2012.  (*Id.*)  To calculate the securities lending earnings for participation in the SLP, he collected Wells Fargo earnings reports and earnings statement addendums for each selected Class member over the June 30, 2007 to December 31, 2012 time frame.  (*Id.*)  He calculated securities lending earnings as the sum of each selected Class member's monthly earnings and Wells Fargo's "forgone earnings that were rebated to selected Class Members over the time period of June 30, 2007, through December 31, 2012."  (*Id.*)  Plaintiffs assert that McConnell improperly relied on unsubstantiated securities prices in calculating potential losses which were used

to offset SLP earnings and arrive at his conclusions regarding net losses.  (Doc. No. 304 at 2.)

## DISCUSSION

### I.     Motion for Decertification

At the motions hearing, Plaintiffs' counsel "agreed that seven of the Class members should be out of the Class."  (Doc. No. 367 ("Tr.") 66.)  On August 27, 2013, the parties stipulated that seven SLP participants, who exited the program prior to September 2006, should be excluded from the class, and the Court entered an order to that effect.[5]  (Doc. Nos. 379 & 381.)

The parties have also identified sixteen ERISA Plaintiffs[6] who have received class notice and who have not opted out of the class.  Wells Fargo argues that these ERISA

---

[5]     The following seven entities are excluded from the Class:  (1) IHC Foundation Inc.; (2) Mid-West Life Insurance Co.; (3) The Chesapeake Life Insurance Co.; (4) The Mega Life & Health Insurance Co.; (5) United Group Reinsurance, Inc.; (6) SIT/Kim Global Fund LLC – International; and (7) SIT/Kim International Fund LLC – International.  (Doc. Nos. 379 & 381.)

[6]     The affidavit in support of the motion for decertification initially identified the following seventeen entities as ERISA Plaintiffs:  (1) Twin City Hospital Workers Pension Fund; (2) The Schwan Food Company Retirement Savings Plan; (3) Longview Fibre Company; (4) ABC Retirement Plan for Cooperatives; (5) Alliant Energy Master Retirement Trust Plan; (6) Bemis Company, Inc. Master Pension Trust; (7) Goose Creek Consolidated Independent School District; (8) ITT Corporation – Employee Benefits Trust; (9) ITT Corporation – ISP for Salaried Employees; (10) Les Schwab Profit Sharing Retirement Trust; (11) MDU Resources Group Inc. Master Trust; (12) Omaha Construction Industry Plans; (13) Presbyterian Healthcare Services; (14) Presbyterian Healthcare Services Employees Pension Plan; (15) Smithfield Foods, Inc. Master Trust; (16) Arizona Laborers Teamsters Local 395 – Pension Trust Fund; and (17) Arizona Laborers Teamsters Local 395 – Defined Contribution Fund.  (Doc. No. 327, Franck Aff.

(Footnote Continued on Next Page)

Plaintiffs are not proper class members in this case, where the only claims at issue are state statutory and common law claims.  Plaintiffs' Amended Complaint asserts no claims under ERISA.

Because CFHERS (on behalf of the Class) has brought only non-ERISA claims, the Court finds that CFHERS cannot adequately represent the interests of the sixteen ERISA Plaintiffs or bring claims on their behalf.  *See* 29 U.S.C. §§ 1132, 1144.  Any claims of those Plaintiffs under ERISA are distinct and separate causes of action, unique from the state statutory claims of the class, which are likely subject to ERISA preemption.  *See, e.g., Tucker v. Berkshire Life Ins. Co.*, 1999 WL 329727, at *6 (D. Mass. May 19, 1999) (concluding that "the named plaintiff . . . would not be able to satisfy the typicality requirement of Fed. R. Civ. P. 23 if he sought to represent class members with ERISA claims because his own claims do not implicate the ERISA statute").  Consequently, the Court grants the motion for decertification with respect to the sixteen ERISA Plaintiffs.  The Court, however, expresses no opinion at this time as to whether the ERISA Plaintiffs may be properly joined in this matter in the event Plaintiffs were to further amend their complaint or add an additional class representative.  (*See* Doc. No. 378.)

---

(Footnote Continued From Previous Page)
¶ 4.)  After the hearing, the parties stipulated that Goose Creek Consolidated Independent School District is not an ERISA plan.  (Doc. No. 369.)

Wells Fargo also argues that there is no common class-wide damages methodology and that CFHERS is thus an inadequate class representative.  Because CFHERS exited the program and sold its collateral, Wells Fargo contends that its damage calculation (and of other participants who have exited the program) starkly contrasts to the cost to exit for those Plaintiffs still in the program.  The Court finds, however, that Plaintiffs' expert's (Frank Torchio's) two alternative methodologies of calculating losses are insufficient to defeat certification.[7]  *Contra Comcast Corp. v. Behrend*, 133 S. Ct. 1426, 1433 (2013) (determining that the damages model at issue "failed to measure damages resulting from the particular antitrust injury on which petitioners' liability [was] premised").

To the extent Defendant claims that it has a unique defense with respect to CFHERS as a result of CFHERS' Lehman holdings, which allegedly bears on typicality and adequacy requirements, the Court also finds this argument lacks merit.  The Court concludes that common issues predominate in this case and that the Class claims can be litigated with common evidence.  With the exception of the ERISA Plaintiffs, the Court

---

[7]     Torchio applied two different methods in calculating CFHERS' damages. (Zamansy Aff. II ¶ 2, Ex. 14 ¶ 3.)  The first method resulted in a damages calculation of $1.283 million based on a "valuation date that extends through the last sale of . . . the improper investments by CFHERS." (Zamansy Aff. II ¶ 2, Ex. 16 at 214: 2-17.)  The second resulted in a damages calculation of about $1 million based on "Wells Fargo's valuation as of the exit date." (*Id.*)  Torchio was unable to compute the other Plaintiffs' damages using the first method, which yielded higher damages for CFHERS, because he did not have sufficient information to do so. (*Id.* at 96-97.)

adopts and incorporates herein its analysis from its order on the motion for class

certification.  (Doc. No. 120.)

## II.     Motions for Summary Judgment

### A.     Summary Judgment Standard

Summary judgment is proper if there are no disputed issues of material fact and

the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The

Court must view the evidence and the inferences that may be reasonably drawn from the

evidence in the light most favorable to the nonmoving party.  *Enter. Bank v. Magna Bank*

*of Mo.*, 92 F.3d 743, 747 (8th Cir. 1996).  However, as the Supreme Court has stated,

"[s]ummary judgment procedure is properly regarded not as a disfavored procedural

shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed

'to secure the just, speedy, and inexpensive determination of every action.'"  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

The moving party bears the burden of showing that there is no genuine issue of

material fact and that it is entitled to judgment as a matter of law.  *Enter. Bank*, 92 F.3d at

747.  The nonmoving party must demonstrate the existence of specific facts in the record

that create a genuine issue for trial.  *Krenik v. County of Le Sueur*, 47 F.3d 953, 957 (8th

Cir. 1995).  A party opposing a properly supported motion for summary judgment "may

not rest upon the mere allegations or denials of his pleading, but must set forth specific

facts showing that there is a genuine issue for trial."  *Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 256 (1986).

### B.    Plaintiffs' Motion for Partial Summary Judgment

Plaintiffs move for summary judgment with respect to twenty-four of

Wells Fargo's affirmative defenses.  Specifically, Plaintiffs seek judgment on affirmative

defenses numbered 4, 6, 11, 15, 18, 19, 21-23, 28, 30-35, 38-41, 43-45, and 48.

Wells Fargo does not oppose Plaintiffs' motion with respect to affirmative

defenses 6, 15, 28, 43, and 48 and agreed to withdraw those defenses at the hearing, as

well as affirmative defense number 7.  (*See* Tr. 90.)  As such, the Court grants Plaintiffs'

motion with respect to defenses 6, 15, 28, 43, and 48 and dismisses affirmative defenses

6, 7, 15, 28, 43, and 48.

Affirmative defenses 18, 19, 21, 22, and 30 are those which seek to limit Wells

Fargo's liability based on the Declaration of Trust.  Plaintiffs in the related *Blue Cross*

case brought a motion on similar defenses, and the Court adopts its analysis herein.

> Having considered the relevant provisions of the Declaration of
> Trust, as well as the entire record, the Court finds that the Declaration of
> Trust does not unambiguously eliminate all of Wells Fargo's
> non-contractual duties to Plaintiffs.  *See COPIC Ins. Co. v. Wells Fargo
> Bank, N.A.*, 767 F. Supp. 2d 1191, 1205-08 (D. Colo. 2011) (finding issues
> of fact regarding the applicable standard of negligence and determining that
> Section 8.4 "does not unambiguously eliminate all non-contractual duties").
> Questions of fact exist as to whether Wells Fargo's investment of collateral
> in risky securities "could fall under the exclusion of liability for an act
> performed by a covered person in a manner reasonably believed to be
> within the scope of authority conferred by the Declaration."  *Workers
> Comp. Reins. Assoc. v. Wells Fargo Bank, N.A. ("WCRA")*, 2012 WL
> 1253094, at *7 (Minn. Ct. App. Apr. 16, 2012), quoting *COPIC*, 767
> F. Supp. 2d. at 1207.  Considering the relevant documents together,
> including the Declaration of Trust, the SLAs, Subscription Agreements, and
> Confidential Memoranda, the relevant standard of care is ambiguous and
> should be resolved by a fact-finder at trial.  *See COPIC*, 767 F. Supp. 2d at
> 1207 (finding conflict between the "gross negligence" standard of the

Declaration and the simple negligence standard of the SLA and determining that "[r]esolution of the interplay among these various provisions, and whether any should be given primacy, should be done by a fact-finder.").

The Court finds that Plaintiffs have neither demonstrated that Wells Fargo's affirmative defenses fail as a matter of law, nor the absence of any genuine issue of material fact sufficient to warrant summary judgment. While the Court acknowledges that Wells Fargo faces a high hurdle to establish that its conduct falls within any exclusion of liability provision contained within the Declaration of Trust, it will be for the jury to decide Wells Fargo's liability, or lack thereof, based on the evidence presented at trial. The Court further notes that other courts and juries that have examined this issue have consistently found that the Declaration of Trust did not eliminate or modify Wells Fargo's fiduciary duties to its investors.[8] *See, e.g. WCRA*, 2012 WL 1253094, at *7. To the extent Plaintiffs further contend that the Business Trust should be disregarded as a "sham entity," such an argument clearly presents questions of fact for the jury.

(Civ. No. 11-2529, Doc. No. 474 at 11-12.)

With respect to the remaining affirmative defenses (4, 11, 23, 31-35, 38-41, and 44-45), the Court concludes, again, that despite the unlikelihood of success at trial on the majority of the defenses, Plaintiffs have neither demonstrated that the affirmative defenses fail as a matter of law, nor the absence of any genuine issue of material fact sufficient to warrant summary judgment.

Consequently, the Court denies Plaintiffs' motion with respect to affirmative defenses 4, 11, 18, 19, 21-23, 30-35, 38-41, and 44-45.

## C.      Defendant's Motion for Partial Summary Judgment

Wells Fargo makes the following arguments in support of its motion for summary judgment: (1) Counts I-III (certified claims) are preempted with respect to the sixteen

---

[8]      The Court acknowledges that it may need to address the proper scope of opening

(Footnote Continued on Next Page)

ERISA Plaintiffs; (2) CFHERS cannot establish the elements of its civil theft claim

(uncertified claim); (3) Plaintiffs cannot establish loss resulting from a breach of

fiduciary duty (certified claim); (4) Plaintiffs cannot establish the elements of their

MCFA claim (certified claim); and (5) CFHERS cannot establish the elements of its

DTPA and UTPA claims (uncertified claims).

As to the ERISA Plaintiffs, as discussed above, the ERISA Plaintiffs are properly

excluded from the Class.  As such, Defendant's motion for summary judgment is moot in

this respect.

With respect to the civil theft claim, Minnesota Statutes Section 604.14 provides

that "[a] person who steals personal property from another is civilly liable to the owner of

the property for its value when stolen plus punitive damages . . . ."  Minn. Stat. § 604.14.

As recently explained by a court in this district:

> There is limited authority examining Minnesota's civil theft statute.
> Although "a criminal complaint, conviction, or guilty plea is not a
> prerequisite to liability" for civil theft, . . . courts rely on the criminal theft
> statute to determine whether a defendant's conduct amounted to theft, *see
> Popp Telcom, Inc. v. Am. Sharecom, Inc.,* Civ. No. 96–1177, 2003 WL
> 1610789, at *9 (D. Minn. Mar. 20, 2003), *aff'd,* 361 F.3d 482 (8th Cir.
> 2004).  The criminal theft statute identifies a wide range of conduct that
> amounts to theft, including "swindling, whether by artifice, trick, device, or
> any other means."  Minn. Stat. § 609.52, subd. 2(4).  Under Minnesota law,
> "the victim's receipt of something of value is not a defense to a charge of
> theft by swindle."  *Popp Telcom,* 2003 WL 1610789, at *9 . . . .  "[T]he gist
> of the offense is the cheating and defrauding of another by deliberate
> artifice" and "[n]o single definition can cover the range of possibilities for
> the offense."  *State v. Ruffin,* 280 Minn. 126, 158 N.W.2d 202, 205 (1968).

---

(Footnote Continued From Previous Page)
statements and other evidentiary issues at the pretrial hearing in this matter.

*Damon v. Groteboer*, Civ. No. 10-92, 2013 WL 1332009, at *16 -17 (D. Minn. Mar. 29,

2013).  Importantly, however, cases in which plaintiffs have been permitted to proceed on

claims of civil theft, including those based on theft by swindle, typically involve an

element of fraud at the time a transaction takes place or property is first obtained.  *See id.*

at *17 ("[T]he Court finds that the Damons' allegation that they were induced to part

with the purchase price by fraud potentially fall [sic] within the ambit of the civil theft

statute."); *Howard v. Webb*, 2007 WL 4393181, at *8 (Minn. Ct. App. Dec. 18, 2007)

("'Stealing' may be understood as requiring wrongful conduct at the time the thief first

obtains property.").  While it is true that someone who "intentionally and without claim

of right . . . retains possession of movable property of another without the other's

consent" may be guilty of theft, Minn. Stat. § 690.52, subd. 2, the theft by swindle statute

is intended to punish "any fraudulent scheme, trick, or device whereby the wrongdoer

deprives the victim of his money or property by deceit or betrayal of confidence." *State*

*v. Carroll*, 2008 WL 1971537, at *2 (Minn. Ct. App. May 6, 2008).  The allegations in

this case, and the evidence in the record, however, do not support a claim that Plaintiffs

were initially tricked or deceived into entering into the SLP.  Rather, this lawsuit arises

from the allegedly improper actions of Wells Fargo in misrepresenting or failing to

disclose material information to Plaintiffs that would have potentially contributed to

Plaintiffs' ability to make an informed decision as to whether to stay in the SLP or exit at

an earlier time.  Moreover, Plaintiffs cannot point to a specific moment at which

Defendant developed the intent to deprive Plaintiffs of their property (on a temporary or

26

permanent basis), and at which point Wells Fargo ceased to have Plaintiffs' permission,

sufficient to permit a reasonable jury to find that Wells Fargo's actions rise to the level of

theft by swindle.[9]  As such, the Court grants Defendant's motion for summary judgment

with respect to Count VI.

The Court has addressed Wells Fargo's arguments with respect to the breach of

fiduciary duty, MCFA, DTPA, and UTPA claims in the related *Blue Cross* litigation, and

the Court adopts its analysis with respect to those claims herein.

With respect to the fiduciary duty claim,

> Plaintiffs have submitted evidence that could lead a reasonable
> fact-finder to conclude that Wells Fargo failed to prudently and
> conservatively invest the SLP collateral, that Wells Fargo abused its
> discretion as trustee, and that Wells Fargo failed to comply with its own
> investment guidelines.  Plaintiffs have also raised issues of fact with respect
> to Wells Fargo's alleged differential treatment of investors regarding their
> exit options, and Wells Fargo's purported failure to disclose material
> information to Plaintiffs pertaining to their investments.
> The Court finds that genuine issues of material fact exist as to
> whether a breach of fiduciary duty occurred, and whether the loss to
> Plaintiffs was the result of such a breach.

(Civil No. 11-2529, Doc. No. 474 at 13.)

Wells Fargo also contends, once again, that the MCFA claim must fail because

this case serves no public benefit.  The Court addressed the public benefit issue in great

detail in its order on Wells Fargo's motion to dismiss in the *Blue Cross* litigation.  (*See*

---

[9]     Plaintiffs allege that Wells Fargo's "wrongful taking" occurred, not at the time the
SLAs were signed, but rather "when Wells Fargo failed to follow its mandates and the
fiduciary duty of prudence."  (Doc. No. 351 at 40.)  Such a claim is nebulous at best.

Civil No. 11-2529, Doc. No. 94 at 12-17.)  The public benefit requirement is not onerous.

*Kinetic Co.*, 672 F. Supp. 933, 946 (D. Minn. 2009).  As the Court has previously noted:

> Wells Fargo is still engaged in securities lending for some Plaintiffs that have not exited the SLP, and Plaintiffs seek an injunction for return of those securities.  Thus, there appears to be an issue of fact with respect to any ongoing or future harm.  Wells Fargo has not demonstrated the absence of genuine issues of material fact on the MCFA claim.
>
> Wells Fargo contends that the DTPA and UTPA claims also fail on similar grounds.  To the extent Defendant argues that those claims do not serve a public benefit, the Court finds this argument unpersuasive for the reasons discussed above.  Defendant further argues that the Private AG statute does not provide a private remedy for purported violations of the DTPA and that Plaintiffs have failed to demonstrate any likelihood of future harm.  The Court concludes that Plaintiffs have demonstrated, at a minimum, genuine issues of material fact with respect to ongoing or future harm and entitlement to injunctive relief.  *See* Minn. Stat. § 325D.45, subd. 1.

(Civil No. 11-2529, Doc. No. 474 at 14.)

In light of the foregoing, Wells Fargo's motion for partial summary judgment is properly denied with respect to the breach of fiduciary duty, MCFA, DTPA, and UTPA claims.

## III.     Motion to Exclude Expert Opinions

Plaintiffs seek to exclude the testimony of Peavy, Porten, and McConnell pursuant to Rule 702 of the Federal Rules of Evidence and the United States Supreme Court's decision in *Daubert v. Merrell Dow Pharms., Inc.,* 509 U.S. 579 (1993).  Before accepting the testimony of an expert witness, the trial court is charged with a "gatekeeper" function of determining whether an opinion is based upon sound, reliable theory, or whether it constitutes rank speculation.  *Daubert*, 509 U.S. at 589–90.  In

*Daubert,* the United States Supreme Court imposed an obligation upon trial court judges to ensure that scientific testimony is not only relevant, but also reliable under the Rules of Evidence. *Id.* at 579.

The proposed expert testimony must meet three prerequisites to be admissible under Federal Rule of Evidence 702. *Lauzon v. Senco Prods., Inc.,* 270 F.3d 681, 686 (8th Cir. 2001). "First, evidence based on scientific, technical or other specialized knowledge must be useful to the fact-finder in deciding the ultimate issue of fact." *Id.* "[I]t is the responsibility of the trial judge to determine whether a particular expert has sufficient specialized knowledge to assist jurors in deciding the specific issues in the case." *Wheeling Pittsburgh Steel Corp. v. Beelman River Terminals, Inc.,* 254 F.3d 706, 715 (8th Cir. 2001). Second, the proposed expert must be qualified. *Id.* Third, the proposed evidence must be reliable. *Id.* The proponent of the expert testimony bears the burden to prove its admissibility by a preponderance of the evidence. *Daubert*, 509 U.S. at 592 n.10.

In determining whether the proposed expert testimony is reliable, the Court can consider: (1) whether the theory or technique can be and has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known rate of potential error; and (4) whether the theory has been generally accepted. *Id.* at 593–94. The purpose of these requirements "is to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the

same level of intellectual rigor that characterizes the practice of an expert in the relevant

field." *Kuhmo Tire Co., Ltd. v. Carmichael,* 526 U.S. 137, 152 (1999).

In *Kuhmo Tire,* the Supreme Court determined, "the trial judge must have

considerable leeway in deciding in a particular case how to go about determining whether

particular expert testimony is reliable." *Id.* In other words, a trial court should consider

the specific factors identified in *Daubert* where there are reasonable measures of the

reliability of expert testimony. *Id.* The objective of that requirement is to ensure the

reliability and relevancy of expert testimony. *Id.*

The Court's focus should be on whether the testimony is grounded upon

scientifically valid reasoning or methodology. *United States v. Dico, Inc.,* 266 F.3d 864,

869 (8th Cir. 2001). "As a general rule, the factual basis of an expert opinion goes to the

credibility of the testimony, not the admissibility, and it is up to the opposing party to

examine the factual basis for the opinion in cross-examination. Only if the expert's

opinion is so fundamentally unsupported that it can offer no assistance to the jury must

such testimony be excluded." *Bonner v. ISP Techs., Inc.,* 259 F.3d 924, 929–30 (8th Cir.

2001).

Plaintiffs generally dispute the reliability of McConnell's methodology and

oppose his use of a hypothetical benchmark portfolio. The Court has addressed

Plaintiffs' arguments in the related *Blue Cross* litigation regarding McConnell's opinions,

and the Court adopts its analysis with respect to McConnell herein.

Having considered the relevant factors, the Court finds that
Wells Fargo has demonstrated that McConnell's opinions are sufficiently

reliable to meet the threshold of admissibility.  While the Court questions
the ultimate impact of McConnell's findings, in light of the entire record,
the Court cannot conclude that McConnell's opinions are so fundamentally
unsupported that they can offer no assistance to the jury; the Court thus
declines to exclude his testimony.

Central to Plaintiffs' motion is Plaintiffs' dispute of the investments
selected by McConnell for his hypothetical benchmark comparison
analysis; Plaintiffs claim that the investments included in that benchmark
do not rise to the requisite "prudent" investor standard.  In this manner,
Plaintiffs also challenge the reliability of McConnell's calculations and
opinions.  Whether McConnell's benchmark portfolio selections are
"prudent" investments, however, is itself a question of fact for the jury.  At
their core, Plaintiffs' challenges appear to go to the weight of McConnell's
testimony, not its admissibility.

As such, Plaintiffs may test the credibility of McConnell's
opinions—and methodology—on cross examination, rebut the testimony
with [their] own witnesses, and submit [their] own contrary expert
evidence; the jury can thus determine the credibility of, and weight to be
given to, McConnell's testimony.  *See, e.g., Rockwood Retaining Walls,
Inc. v. Patterson, Thuente, Skaar & Christensen, P.A.,*  Civ. No. 09-2493,
2011 WL 2845529, at *5 (D. Minn. July 18, 2011).  Here, the Court
resolves any doubts regarding the overall value of McConnell's testimony
in favor of its admissibility.  *See Clark by Clark v. Hendrick*, 150 F.3d 912,
915 (8th Cir. 1998) (noting that "doubts regarding whether an expert's
testimony will be useful should generally be resolved in favor of
admissibility").  Of course, the admissibility of McConnell's testimony will
be subject to the proper foundation being laid, especially as it relates to the
hypothetical benchmark SLP.

(Civil No. 11-2529, Doc. No. 474 at 17-18.)

The Court reaches the same conclusion with respect to Porten and Peavy.

Plaintiffs contend that Porten and Peavy are not functioning as experts, but rather subvert

the deposition testimony of lay witnesses.  Plaintiffs claim that because Porten and Peavy

adopt the self-serving conclusions of Wells Fargo's employees and lack independent

reasoning or methodology, their opinions constitute impermissible *ipse dixit*.  As with

McConnell, Plaintiffs may test the credibility of Porten and Peavy's methodology and

opinions on cross-examination and submit their own contrary evidence.  Once again, the Court resolves any doubts regarding the value of Porten and Peavy's testimony in favor of its admissibility.

As such, the Court denies Plaintiffs' motion to exclude McConnell, Porten, and Peavy's reports and testimony.

## ORDER

Based upon the foregoing, and the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.      Wells Fargo Bank, N.A.'s Motion to Decertify the Class (Doc. No. [322]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

a.      The motion for decertification is **GRANTED** with respect to the sixteen ERISA Plaintiffs.  As such, the following entities are excluded from the Class:  (1) Twin City Hospital Workers Pension Fund; (2) The Schwan Food Company Retirement Savings Plan; (3) Longview Fibre Company; (4) ABC Retirement Plan for Cooperatives; (5) Alliant Energy Master Retirement Trust Plan; (6) Bemis Company, Inc. Master Pension Trust; (7) ITT Corporation – Employee Benefits Trust; (8) ITT Corporation – ISP for Salaried Employees; (9) Les Schwab Profit Sharing Retirement Trust; (10) MDU Resources Group Inc. Master Trust; (11) Omaha Construction Industry Plans; (12) Presbyterian Healthcare Services; (13) Presbyterian Healthcare Services Employees Pension Plan;

(14) Smithfield Foods, Inc. Master Trust; (15) Arizona Laborers Teamsters

Local 395 – Pension Trust Fund; and (16) Arizona Laborers Teamsters

Local 395 – Defined Contribution Fund.

      b.      As stipulated by the parties, the following seven entities are

also excluded from the class:  (1) IHC Foundation Inc.; (2) Mid-West Life

Insurance Co.; (3) The Chesapeake Life Insurance Co.; (4) The Mega Life

& Health Insurance Co.; (5) United Group Reinsurance, Inc.; (6) SIT/Kim

Global Fund LLC – International; and (7) SIT/Kim International Fund

LLC – International.

      c.      In all other respects, the motion is **DENIED**.

2.      Plaintiffs' Motion for Partial Summary Judgment on Certain of Wells

Fargo's Affirmative Defenses (Doc. No. [309]) is **GRANTED IN PART** and **DENIED**

**IN PART** as follows:

      a.      Wells Fargo's affirmative defenses numbered 6, 7, 15, 28, 43,

and 48 are hereby **DISMISSED**.

      b.      In all other respects, the motion is **DENIED**.

3.      Wells Fargo Bank, N.A.'s Motion for Partial Summary Judgment (Doc.

No. [315]) is **GRANTED IN PART** and **DENIED IN PART** as follows:

      a.      The motion is **DENIED** with respect to Plaintiffs' breach of

fiduciary duty, MCFA, DTPA, and UTPA claims.

   b.  The motion is **DENIED AS MOOT** to the extent

Wells Fargo seeks judgment as to the claims of the sixteen ERISA

Plaintiffs.

   c.  The motion is **GRANTED** with respect to CFHERS' claim

for civil theft.  As such, Wells Fargo is entitled to judgment as to Count VI

of the Amended Complaint (Doc. No. [277]).

  4.  Plaintiffs' Motion to Exclude the Reports and Testimony of Defendant's

Proposed Experts (Doc. No. [302]) is **DENIED**.


Dated:  September 17, 2013    s/Donovan W. Frank
            DONOVAN W. FRANK
            United States District Judge